EDB
F.# 2001RO0515


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -              01 CR 917(S-3)(ILG)

ILAN ARBEL,

            Defendant.

- - - - - - - - - - - - - - - -X


### GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE
### DEFENDANT'S REQUEST FOR A REDUCED SENTENCE


ROSLYNN N. MAUSKOPF
United States Attorney
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201


ELAINE D. BANAR
Assistant U.S. Attorney
CRAIG HEREN
Legal Intern
(Of Counsel)

2

## PRELIMINARY STATEMENT

The government submits this memorandum in reply to the defendant, Ilan Arbel's, request for a non-guidelines sentence of 60 months imprisonment.  In sum, Arbel argues that the factors under 18 U.S.C. § 3553, including (1) the nature and circumstances of the offenses; (2) his history and characteristics; (3) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment and afford adequate deterrence; (4) protect the public from future crimes by Arbel; (5) provide Arbel with needed medical, vocational or medical assistance; (6) whether or not a role enhancement applies; and (7) sentencing disparities all militate in favor of a non-guidelines sentence.  As we show below, Arbel's claims are meritless and his sentence of 120 months, which was appropriate and reasonable, should stand.

We also request that the court impose a forfeiture order in the amount of $8 million and order Arbel to pay the mandatory restitution of $40 million, pursuant to 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1.

I.                    STATEMENT OF FACTS

    A.    The Scheme

        Arbel was a stock promoter who became involved, along with numerous other defendants, in a scheme to manipulate the market price of stock and stock warrants that traded on the NASDAQ Small Capitalization stock market and the Over-the-Counter Bulletin Board Market by employing various deceptive sales practices with respect to public consumers through a brokerage firm, Euro Atlantic Securities ("Euro Atlantic"), and to launder the proceeds of that fraud. Arbel provided large blocks of securities of companies he controlled -- among them, American Toys, Mr. Jay's Fashions International, Inc., U.S. Wireless Corp., Multi Media Concepts International, Inc. ("MMCI"), and Hollywood Productions, Inc. -- to Euro Atlantic at discount prices. He controlled these stocks primarily through off-shore investment companies, which included, among others, European Ventures Corp. ("EVC"), Europe American Capital corporation ("EACC"), and Vermugaenstruehan ("VTH"). Brokers at Euro Atlantic created artificial demand for the securities through fraudulent means in order to inflate the price of the securities. Arbel then sold the stock through Euro Atlantic into the inflated market, reaping enormous profits. As a result of

4

the scheme, thousands of victims were defrauded of between $40 and $80 million dollars.  (PSR ¶¶ 9-14).[1]

Arbel and his co-defendants used various nominee accounts to disguise Euro Atlantic's, and ultimately Arbel's, ownership of the stocks, including stock in MMCI and Hollywood, two of the house stocks sold by Euro Atlantic.  The profits accumulated from the scheme were then placed into accounts Arbel controlled at two brokerage firms, Patterson Travis and Robb Peck McCooey which had been opened in the name of EVC and EACC.  The funds were ultimately transferred to bank accounts located in the United States and abroad, and Arbel secretly paid kickbacks from these proceeds to Euro Atlantic.  He and his co-defendants attempted to disguise the kickbacks as fictitious personal loans, false mortgage deals and stock transactions, among other things.  PSR ¶¶ 9-14.

On March 3, 2003, Arbel was indicted on charges of conspiracy to commit securities fraud,  two substantive securities fraud counts, money laundering conspiracy, a substantive money laundering count, conspiracy to commit unlawful monetary transactions and obstruction of justice.  The indictment included a forfeiture allegation.

---

[1]     Parenthetical references preceded by "Sent. Tr." and "Plea Tr." refer to the Sentencing and Plea proceedings; "Tr" refers to the trial transcript; "GX" refers to government exhibits; and "PSR" refers to the Presentence Report.

B.    Arbel Attempts To Influence
      The Testimony Of Christopher Wolf

On March 26, 1999, Christopher Wolf, a co-defendant and fellow participant in the Euro Atlantic scheme, was arrested on various securities fraud and money laundering charges relating to a separate scheme.  See United States v. Wolf, 99-CR-139 (NG). Wolf, who was represented at the time by Clifford Lazzaro, Esq., was detained without bail and housed at the Metropolitan Detention Center ("MDC"), where his telephone calls were recorded pursuant to standard prison policy.  During several calls throughout the months following his arrest, Wolf expressed concern to his girlfriend, Sharon Sibbio, about obtaining money from Arbel to pay for an attorney.  March 1, 2004 Sentencing Reply Memo at 5-6 (hereinafter "March 2004 Memo"); PSR ¶ 42.

At the time of Wolf's arrest, Arbel had not yet been charged, but was well aware of a broad investigation of Hanover Sterling, another brokerage firm engaged in a similar fraudulent scheme with which Arbel was involved and from which over 50 participants were ultimately found guilty of securities fraud.  In addition, a Business Week article regarding illegal financial activities of La Cosa Nostra placed Arbel on notice that his activities had attracted the attention of law enforcement. Moreover, many other individuals who had sold stock for Arbel were being charged with stock fraud.  March 2004 Memo at 5-6.

6

In late April 1999, Wolf provided incriminating information about Arbel. He stated that, among other things, Arbel had paid him $500,000 to fund the Euro Atlantic and to run an unlicensed floor at Euro Atlantic run by Enrico Locasio and Dominic Dionisio, two members of the Colombo crime family. Although Wolf provided important information about the fraudulent activity of Arbel and others, the government eventually ceased pursuing his cooperation out of concern about his lack of candor regarding his own criminal conduct. March 2004 Memo at 6.

On June 11, 1999, Gerald Shargel, Esq. entered his appearance on behalf of Wolf after which Wolf refused to cooperate. Shargel's fees were paid on June 16, 1999, by a check for $50,000 drawn on an account in the name of U.S. Apparel, a publicly held company controlled by Arbel. On May 3, 2000, Wolf pleaded guilty to securities fraud conspiracy and money laundering conspiracy, among other charges. Wolf later fired Shargel and retained Allan Ellis, Esq., whose fees were also paid by Arbel.

While preparing for Arbel's trial, the government obtained documents showing numerous payments by Arbel to Wolf's mother, Lucy Prestino. The first such payment -- for $5,000 -- was made on June 15, 1999, the day before the first $50,000 payment to Shargel on Wolf's behalf. Moreover, from September 2000, through August 2001, Arbel regularly directed his secretary, Allyne Goode, to draw checks in the amount of $500 on a business account for U.S.

Apparel and make them out to "cash."  Once these checks had been
signed by Arbel, Goode was instructed to convert them to money
orders and mail those to Prestino at a Florida residence.  Arbel's
ledgers showed that the $500 payments were falsely written off as
"office expenses" for U.S. Apparel.  Notably, the payments to
Prestino ceased in August 2001, when Arbel was arrested.  March
2004 Memo at 5-8.

     C.   <u>Arbel's Guilty Plea</u>

     On March 3, 2003, after a week of trial at which two of
his co-defendants, David Melillo and Glen Deluca, testified, Arbel
pleaded guilty, pursuant to a plea agreement, to a superseding
information charging him with conspiracy to commit securities
fraud, in violation of 18 U.S.C. § 371, and two substantive
securities fraud counts, in violation of 15 U.S.C. §§ 78j(b) and
78ff, arising out of fraudulent activity at Euro Atlantic.  The
plea agreement set forth the following Guidelines calculations: a
base offense level of 6, <u>see</u> U.S.S.G. § 2F1.1(a); a 17-level
increase because the loss occasioned by the fraud exceeded $40
million, <u>see</u> U.S.S.G. § 2F1.1(b)(1); a two-level increase because
the scheme involved more than minimal planning and defrauded
multiple victims, <u>see</u>  U.S.S.G. § 2F1.1(2); a four-level increase
for Arbel's role as an organizer, <u>see</u> U.S.S.G. § 3B1.1(a); a two-
level enhancement for obstruction of justice, <u>see</u> U.S.S.G. § 3C1.1;
and a three-level reduction for acceptance of responsibility, <u>see</u>

8

U.S.S.G. § 3E1.1(b)(1).  The resulting adjusted offense level of 28
carried a range of imprisonment of 78 to 97 months.  Plea Agr. at
4.

The agreement also provided for forfeiture of $8 million
dollars and required, among other things, that Arbel comply with
the terms of a Consent Order of Forfeiture by filing a truthful and
complete Financial Statement setting forth all of the companies,
entities or accounts he controlled, either directly or indirectly
or through third parties.  Id. at 5-8.  The agreement provided that
if Arbel failed fully to disclose his assets, he would be in
material breach of the agreement and the government could seek
forfeiture of up to $20 million in undisclosed assets.  Id. at 8-9.

The PSR recommended an adjusted offense level of 29,
employing virtually the same calculation as set forth in the plea
agreement, but assigning a two-level reduction for acceptance of
responsibility, rather than the three levels set forth in the plea
agreement.  PSR ¶ 58.  The applicable range of imprisonment was,
accordingly, 87 to 108 months.  PSR ¶ 98.

    D.    Arbel's Failure To Disclose Assets

In contravention of his plea agreement, Arbel immediately
failed to provide complete information about the companies he
controlled.  Shortly after the plea proceeding, the government
learned of 40 such companies, and it provided the district court
and Arbel's lawyer with a list of them.  Subsequently, Arbel

9

completed a second Financial Statement listing over 50 companies,
including those omitted from the first statement.  Sent. Tr. at
37-38.  Like the first one, the second Financial Statement was
represented to be a true and complete list of all of the companies
Arbel controlled and was incorporated into the plea agreement.
Plea Agr. at 11; November 5, 2003 Sentencing Letter (hereinafter
"November 2003 Letter") at GX 1.  In addition, Arbel averred in
both the Financial Statement and in letters to the U.S. Probation
Department, that he no longer controlled these entities, that most
were defunct and that he had no remaining assets of any kind.  Id;
March 2004 Memo at 24-25; Arbel Letters to Probation.

       Shortly after his guilty plea, the government began to
monitor Arbel's jailhouse conversations, obtaining recordings that
demonstrated his continued access to funds through relatives in
Israel and other third parties and his further attempts to engage
in other suspicious securities-related transactions from prison.
November 2003 Letter at 16-20.

       In addition, Arbel failed to disclose the existence of
several offshore bank accounts under his control and for which he
was listed as the sole beneficiary.  An account at Banque SCS
Alliance in Switzerland, was in the name of EVC and contained
$47,291.00.  The second account, which was in the name of American
Telecom Corporation at Banque Cial, Switzerland contained
$20,192.31.  March 2004 Memo at 1-2.

E.   The Government's Sentencing Memoranda

Prior to sentencing, the government submitted two lengthy memoranda setting forth evidence that Arbel had: (1) continued to engage in criminal conduct while incarcerated by misrepresenting the value of companies and stock he controlled to persuade unsuspecting investors to buy stock in those companies; and (2) obstructed justice by (i) attempting to influence the testimony of Christopher Wolf by paying his attorney's fees and making payments to Wolf's mother; and (ii) failing to disclose assets as the plea agreement required.  The government further argued that as a result of this conduct, Arbel did not deserve a reduction for acceptance of responsibility.  In addition, it sought an upward departure due to this conduct or, alternatively, a horizontal departure to a higher Criminal History Category on the ground that the lower Criminal History Category attributable to Arbel under-represented the likelihood that he would commit crimes in the future in light of this post-plea behavior.  November 2003 Letter; March 2004 Memo.

F.   The Sentencing

At sentencing on April 22, 2004, this district court concluded that Arbel's payments to Wolf's lawyers and Wolf's mother and his failure to disclose assets constituted obstruction of justice, warranting imposition of a two-level enhancement.  Sent. Tr. at 36-38.  The court further imposed a 4-level enhancement for

Arbel's role as an organizer in the fraud scheme at Euro Atlantic.
Id. at 44-45.  It declined to award a reduction for acceptance of
responsibility based on the untimeliness of the guilty plea and
Arbel's failure to disclose assets as required by his plea
agreement.  Id. at 6-8.  Finally, the Court entered a forfeiture
judgment in the amount of $20 million.  Id. at 62-63.  Although the
court indicated that restitution was mandatory, restitution was
never imposed or made part of the Judgment of Conviction.  Id.; GX-
1.

G.    The Appeal

Arbel appealed his sentence on the grounds that the
district court erroneously enhanced his sentence for: (1) more than
minimal planning; (2) being an organizer; (3) obstructing justice;
and (4) refusing to grant him any reduction for acceptance of
responsibility.  Arbel also argued that the Court's $20 million
forfeiture order was in error.  After the appeal was filed, two
decisions were handed down: United States v. Booker, 125 S.Ct. 738
(2005), and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).
As a result, both parties stipulated to a remand under Crosby and
the government further agreed that the $20 million forfeiture order
was erroneously imposed.  The motion for remand was granted by the
Court of Appeals.  United States v. Arbel, 127 Fed.Appx. 518, 520
(2d Cir. 2005).

12

II.                          ARGUMENT

       A.    The District Court Considered All of the Factors Under 18
             U.S.C. § 3553, and Sentenced Arbel Appropriately Under
             Crosby

       Arbel contends that the court failed to consider certain

factors set forth in 18 U.S.C. § 3553, as required by Crosby, and

as a result, Arbel should be given a "different sentence."  Arbel

Br. at 6.  Arbel is wrong.

       In Crosby, the Second Circuit articulated principles to

guide post-Booker sentencing determinations.  397 F.3d at 113.  The

Court stated that a sentencing judge normally must determine the

applicable sentencing range under the Sentencing Guidelines; must

consider that Guidelines range and the other factors listed in 18

U.S.C. § 3553(a); and must decide on whether to impose a sentence

within the applicable Guidelines range or "within permissible

departure authority," or a non-Guidelines sentence.  Id.  While the

Court repeatedly noted the requirements that district courts

consider both the applicable Guidelines range and the other Section

3553(a) factors, the Court declined to define proper

"consideration" of any factor.  Id.  Instead, the Court cited

approvingly its prior decisions concerning the duty to "consider"

sentencing factors, stating that those decisions "refrained from

imposing any rigorous requirement of specific articulation by the

sentencing judge."  Id.  This Court "no more require[s] 'robotic

incantation' by district judges than [it] did when the Guidelines

were mandatory." Id.; see also United States v. Fleming, 397 F.3d 95, 100 (2d Cir. 2005)(requisite consideration occurs where "judge is aware of both the statutory requirements and the sentencing range or ranges that are arguably applicable").

In United States v. Williams, 436 F.3d 706, (6th Cir. 2006) that Court reaffirmed that: "Accordingly, we presume, in the absence of record evidence suggesting otherwise, that a sentencing judge has faithfully discharged her duty to consider the statutory factors." Id. at 708 (commenting that consideration under the post-Booker regime "need not be evidenced explicitly" and rejecting the argument that the District Court failed to consider the § 3553(a) factors where the defendant "fail[ed] to point to any indication that the district court ignored those factors"); United States v. Ayers, 428 F.3d 312, 315 (D.C. Cir. 2005) (explaining that when a defendant fails to object to the lack of an explanation on the record for the imposition of a sentence within the Guidelines range, "we begin our review with the presumption that the district court knew and applied the law correctly" and also establishing a presumption that a judge imposing a non-Guidelines sentence "took into account all the factors listed in § 3553(a) and accorded them the appropriate significance" (internal quotation marks omitted)); United States v. Fernandez, 2006 WL 851670, *9 (2d Cir. Apr. 3, 2006) (additional citations omitted). The Fernandez Court also made clear that a "court's reasoning can often be

14

inferred by comparing what was argued by the parties or contained
in the pre-sentence report with what the judge did." 2006 WL
851670, *8, (quoting United States v. Jimenez-Beltre, 2006 WL
562154, *3 (1st Cir. 2006)).

Applying these principles, this court's lengthy and
detailed comments at sentencing demonstrate that it considered the
necessary factors in arriving at an appropriate and reasonable
sentence of 120 months imprisonment, a sentence within the
guidelines range applicable to Arbel, even if each factor under
Section 3553(a) was not specifically recited, and that the sentence
imposed was not based on a belief that it was constrained by the
then-mandatory nature of the guidelines.

1.  Nature and Circumstances of the Offense

First, Your Honor acknowledged in detail the nature and
circumstances of the offense. See 18 U.S.C. §3553(a)(1). Indeed,
the Court opined that the criminal conduct engaged in by Arbel was
so enormous that the applicable guidelines range might not
adequately take into account the seriousness of the offenses and
the extent of the harm caused his numerous victims:

> Some people wonder about the relationship
> between a bank robber, a person who commits
> violent crime, even organize crime members and
> why they're punished usually more severely
> than white collar criminals that you would be
> described as being, a white collar criminal,
> but when one stops to think of the harm that
> is done by white collar criminals such as you,
> having really badly, badly, affected the lives
> of I don't know how many hundreds of people

> who have lost their life savings, whose lives
> have been terribly altered because of these
> pump and dump operations which you were
> behind, you wonder whether in many respects
> your crime is far more serious, far more
> harmful.

Sent. Tr. at 59.

Notably, Arbel's crimes, which this Court found "can only charitably be described as fraud in stealing from gullible, innocent people," Sent. Tr. at 45, is precisely the type of conduct that Congress and the Sentencing Commission intended to deter with strong penalties.

In the Insider Trading and Securities Fraud Enforcement Act of 1988 ("Act"), Congress doubled the maximum term of imprisonment for a violation of 15 U.S.C. § 78j(b), raising it from 5 years to 10 years. The House committee report for the Act stated that its reforms were "necessary to enhance deterrence against insider trading, and where that deterrence fails, to augment the current methods of detection and punishment of this behavior." H.R. Rep. No. 100-910, at 7 (1988), reprinted in U.S.C.C.A.N. 6043. The definition of insider trading used in the report refers to "the purchase or sale of securities while in possession of 'material' information ... that is not available to the general public." Id. at 8. The increased sanctions provided by the Act were considered necessary to deter insider trading and other white-collar crimes, reflecting the view that "increasing the certainty of a substantial

prison term is the type of message white-collar criminals will understand the best." Id. at 16.

Clearly, Arbel's conduct constitutes insider trading in that he and his corrupt brokers possess nonpublic material facts regarding his ownership of stock in companies he controlled which stock was inflated through deceptive and high-pressure tactics. Insider trading includes many other forms of conduct which are far *less* deceptive and harmful than Arbel's. Indeed, the paradigm cases of insider trading cited in the report as necessitating passage of the Act only involved taking advantage of upcoming changes in the stock prices of legitimate corporations, not undertaking extensive efforts to *create* such changes by inflating and manipulating the prices directly. Id. at 12-13. Without question, Arbel's conduct was even *more* serious than the bulk of the insider trading Congress sought to deter in passing the Act.

The United States Sentencing Commission recognized the need to deter and punish extensive frauds such as Arbel's. In 1989 the Sentencing Commission amended Guideline Section 2F1.1(b)(1), covering fraud and deceit, so as to substantially increase the offense level for frauds causing a loss above $40,000. United States Sentencing Commission, Guidelines Manual: Appendix C (Volume I) 82 (2003). This amendment added 6 levels to the offense level that would have previously resulted from a fraud, such as Arbel's, that caused a loss of between $40,000,000 and $80,000,000. Id.

The purpose of the amendment was, among other things, "to increase the offense levels for offenses with larger losses to provide additional deterrence and better reflect the seriousness of the conduct."  Id. at 83.  Therefore, both Congress and the United States Sentencing Commission were concerned with providing adequate penalties for conduct that, like here, resulted in substantial fraud losses.

The nature and circumstances of the offenses to which Arbel pleaded guilty are substantially more serious than the average insider trading or securities fraud case due not only to the fact that the fraud loss was between $40 and $80 million, but the impact to hundreds of Arbel's victims, and the court noted so:

> A lot of letters that I received from people whose lives have been shattered in many respects as a result of the fraud which was perpetrated as a result of having taken their life savings, their retirement accounts and invested it in these worthless stocks and now in their old age virtually penniless. [sic]

Sent. Tr. at 39.

Although Arbel admits here, as he must, that his crimes were serious, he claims he made attempts to do good.  For example, Arbel argues that he believed that monies he owed to Allyne Goode, his long-time secretary, had been paid from a business account by his former wife, and that Goode had been "made whole".  Arbel Br. at 7.  Arbel further offers that if that is not the case, he will make Goode "the highest priority" in the event he "is in the

18

position to pay." Id. Given that Arbel has yet to pay any of the

hundreds of victims both here and abroad that he defrauded, let

alone satisfy the $8 million forfeiture order, this promise cannot

be taken seriously. In any event, Arbel's version of events as to

his intent to repay Goode is in stark contrast to what Ms. Goode

remembers occurred:

> After depositing $3,000, I was informed Mr. Arbel
> instructed his wife to close the account and I am stuck
> with not being able to collect this debt. I feel
> personally that I was Mr. Arbel's last victim before he
> was placed in jail.

Sent. Tr. at 58. Arbel also omits that he used Goode to further

his crimes:

> I'm looking at letters, looking at a letter from Allyne
> Goode. She wrote to me and said I worked 12 years as
> secretary-treasurer and bookkeeper for Mr. Arbel's public
> companies. I also was his personal secretary. Unknown
> to me during this time of employment he forged my
> signature on corporate papers to sell stock for his own
> profit.

Sent. Tr. at 57. Thus, Arbel can hardly be believed with respect

to these latest purported good intentions given his history of

using people, including his employees, and stealing from them to

perpetrate frauds.

Nor should this court take seriously Arbel's absurd

claims that he was threatened during or after the period he engaged

in these crimes and that it was he who was "used and extorted."

Arbel Br. at 8. First of all, the record is completely void of any

evidence, other than Arbel's recent unsubstantiated assertions,

that he was threatened to commit securities fraud by anyone at anytime.   Neither Melillo or Deluca, two of Arbel's closest confederates, testified to such actions, nor was there anything in the proffer statements by Christopher Wolfe, as Arbel suggests, that indicate such threats.

As the testimony at trial demonstrated, Arbel, Melillo, and others, after setting up Euro Atlantic, discussed how to prevent the problems with "short sellers" that had contributed to the demise of Hanover Sterling, a former Arbel-controlled boiler room.   This included bringing in persons who could put pressure on potential brokers attempting to short sell Arbel's stock.   Tr. 237-239, 265.   Melillo and Arbel discussed obtaining crews of brokers willing to engage in high pressure sales tactics.   According to Melillo, Arbel expressed excitement about Wolf coming to Euro Atlantic because Arbel knew Wolf's reputation at Hanover for being a power broker and selling a lot of stock.   Arbel was also pleased about Locasio and Dionisio's presence at Euro Atlantic, despite their organized crime connections, since he knew they could apply the needed pressure on the short sellers[2] as well as bring with them a crew of corrupt brokers willing to sell Arbel's stock at inflated prices.   Tr. 258-264, 266-68.   To promote the operation,

_____

[2]/ According to Mellilo, Arbel even financed a trip by Mellilo and Carapella to Las Vegas to pressure a short seller by offering him shares in other Arbel companies in return for his agreement to stop the short sales which were affecting the price of Arbel's stock being sold at Euro Atlantic.   Tr. at 268-272.

Arbel agreed to fund start up costs for the floor of Euro Atlantic brokers run by Locasio and Dionisio.  Tr. 262, 285-86.  This was corroborated by Wolf's earlier statements to the government that Arbel funded a floor at Euro Atlantic controlled by them.  March 2004 Memo at 6.  According to Melillo, it did not matter to Arbel whether Locasio, Dionisio or Wolf were associated with the mob as long as they could manipulate the price of his stock and control the brokers at Euro Atlantic.  Tr. 261-268, 378.

Indeed, Arbel's close connections to members of organized crime was evidenced even after his arrest when he attempted to bribe Wolf in the hope that Wolf would not cooperate against him. Thus, Arbel well-knew about the organized crime connections of Locasio, Dionisio and Wolf before he became involved with them, and welcomed their participation not only for what they could do to promote his illegal stock scheme, but for how they could control anyone who got out of line.  Furthermore, Arbel's knowledge of an assault of another broker by an alleged mobster, Arbel Br. at 9-10, did not appear to bother him much since it did not dissuade him from continuing to engage in securities fraud afterward, as demonstrated by his continuing criminal activities at Euro Atlantic, the international transfer of massive sums of fraud proceeds, and his attempts to fund other boiler room operations after Euro Atlantic closed.  Notwithstanding Arbel's claimed threats now, he certainly never mentioned them in any of his

21

meetings with the government.[3/]  We submit the reason he did not is because they simply never happened.

As for Arbel's ridiculous claims that he attempted to cooperate and should be given credit, this court should ignore them.  Arbel proffered on two occasions with the government during which he lied about the extent of his financial holdings and assets, including assets the government later discovered were hidden in accounts abroad, misrepresented his association and control over numerous companies, and minimized the extent of his knowledge and involvement in the instant offenses.  Moreover, there is absolutely no evidence, and Arbel provides none, that this Office ever contemplated using his testimony or cooperation.  Thus, he is not entitled to "non-5K1.1 cooperation" credit, or any other cooperation credit and his request otherwise is without merit.  See Arbel Br. at 10.

Finally, as this court recalls, the serious nature and circumstances of the instant offenses did not stop Arbel from committing other criminal activity from his jail cell, a fact he completely ignores now.  This conduct included discussing, in coded language, shady investment deals with businessmen, an inmate and a

---

[3/] Arbel's story that he was threatened in prison can hardly be believed given his lack of substantiation, and more importantly, his history of deceiving the government and this Court.

22

lawyer[4]/, as well as conversations with Rivka Arbel about moving funds we believe Arbel concealed in Israel[5]/. These many conversations, coupled with interviews conducted with Arbel's post-plea investment victims, were described in great detail in the government's November 2003 Letter. Based on this post-plea conduct, the government sought an upward departure in Arbel's guidelines or a horizontal departure in his Criminal History Category. Notwithstanding its decision not to increase Arbel's sentence for this conduct, this court acknowledged that the

---

[4]/ For example, in a July 2003 coded tape recorded conversation, Arbel discusses a proposed investment deals by referring to "worshippers" and "synagogues" and "regular seats", in order to disguise questionable securities transactions. See November 2003 Letter at 9-11. In another conversation, Arbel told Itzak, one of the California businessmen that a "lawyer" was already taking care of the "paper" for the "synagogue", when in fact the lawyer, identified as A.S., had only recently been persuaded by Arbel to invest in the same shady deal. See id. at 11-12. In yet another conversation, Arbel tells Eli, the second businessman, that USBH is a viable company "branching out" and that the new investors would "double and triple" their money, when Arbel already new that the company was worthless. Id. at 14-15.

    In another recorded conversation, Arbel asked Rivka to take over as president of USBH for six weeks after which he planned to dump his stock once the price had been artificially inflated. See Id. at 16-17; 19-21. Arbel later attempts to discourage Shlomi Applebaum from having Eli convert his USBH stock by promising that Eli will receive dividends, even though, like most of Arbel-controlled companies, had never shown a profit or reported dividends to shareholders. Id. at 21-27.

[5]/ For example, in one conversation, Arbel and Rivka discuss, in coded language, funneling money to Dory Arbel which would be disguised as a legitimate business transaction. See November 2003 Letter at 32-34. In another conversation, Arbel also directs Rivka to make sure she maintained a "positive" appearance with the California businessmen so that the men would continue to believe the purported deal is real, when it was not, and invest monies with Arbel. Id. at 34-36. In yet another conversation, Arbel directs Rivka again about moving money from a purported "inheritance" to Dory Arbel through one of his "companies". Id. at 36-39. This is significant particularly when Arbel has maintained, and continues to maintain, that he has no inheritance, and no monies whatsoever to pay the $8 million Forfeiture Money Judgment, or restitution to his hundreds of fraud victims. Finally, Arbel instructs Rivka to be careful about what she says over the telephone--referring to stock transactions in the name of Zoe, his daughter, as "ten thousand pieces" and "knitting needles". Id. at 40-46; 46-49.

government had made its case for an upward departure by "clear and convincing" evidence. Sent. Tr. at 36-37. Anyway, Arbel's blatant disregard for the law by attempting to conduct corrupt investment deals after his fraud conviction, and his communications with Israeli relatives we believe helped him perpetrate frauds and conceal assets, outweighs his assertions now that he is a changed man and has learned from his short time in prison.

2.   <u>History and Characteristics of The Defendant</u>

Second, contrary to Arbel's claims here, the record amply reflects that Arbel's history and characteristics were reported and acknowledged by the district court, including Arbel's military service and his personal family circumstances, before sentence was imposed.

At the outset, Arbel's complete personal and family history was set forth in great detail in his PSR, which was before the court prior to his sentencing. Moreover, at sentencing, the court specifically commented on Arbel's successful educational, military and business background and wondered why someone with so many opportunities available to him still committed significant crimes:

> What I don't understand is you're obviously a very creative and bright man. You earned a degree of bachelor of economics from Hebrew University or Tel Aviv University. You went to what is the equivalent in this country of the West Point of Israel. . .You're a man who has obviously an enormous amount of ability because it takes an enormous amount of ability to juggle I don't know how many dozens of companies you were juggling and

24

> how many financial manipulations you were involved in
> getting a lot of gullible people to invest a lot of money
> which you knew they would be investing in worthless
> stocks.  If you had only put your ability and your talent
> and your creativity to legitimate ends, to honest
> purpose, you might have been justly successful, not be
> standing before a Court waiting to be sentenced.

Sent. Tr. at 59-60.  Arbel also characterized his own upbringing,

economic and family circumstances as "very comfortable."  PSR ¶¶ 64

and 62.

The court further recognized the pain caused Arbel's

family as a result of his criminal conviction and the years he will

spend in jail, but made clear, this hardship was Arbel's fault

alone:

> People like you, Mr. Arbel, are enigma's to
> me.  There isn't a person who stands before me
> as you are standing before me this afternoon
> who doesn't tell me how hard it's going to be
> for their families and I continue to hope that
> before persons like you get involved in the
> kind of criminal conduct that you are involved
> in for many years, you give some thought to
> what might happen to your family if you're
> going to get caught.  You don't give any
> thought to that until it's too late.

Sent. Tr. at 56-57.  Arbel pleads now that a reduced sentence is

appropriate because he misses his daughter and hopes to be "a

father to her outside of prison."  Parson's April 30, 2007 Letter

at 2.  This is curious given Arbel's recent offer to withdraw his

motion for a sentence reduction if the government agreed to

transfer him to Israel.  One can only imagine how Arbel hoped to be

a "better father" while living in Israel when his daughter resides

in the U.S.  Notwithstanding his claims to the contrary, we submit that Arbel's request for a sentence reduction is in no way motivated by a desire to be a better father, but a means to get out of jail anyway he can.  In any event, Arbel's family circumstances are no more impressive or extraordinary than others imprisoned for having committed serious crimes and should not be a basis for a reduced sentence here.

Arbel nevertheless maintains that he is a different man now than when he committed the instant offenses.  Specifically, Arbel says that during the commission of these crimes, he was "removed from the face-to-face fraud (unlike the brokers in this case) with the victims. . ." and did not fully appreciate, as he purports to now, the true harm he caused others.  Arbel Br. at 13. This excuse is hard to reconcile given that Arbel swindled Andreas Ruegg of $250,000 just before his trial in this case, see November 2003 Letter at 60-61, defrauded more than 2,000 persons across Europe in a scheme in which he sold recycled and worthless shares of stock he or his family members controlled, see id. at 62, and, from his jail cell *after* pleading guilty, stole thousands more from two California businessmen, an inmate and an attorney, by misrepresenting, in coded prison conversations, the worth and ownership of various companies he controlled in an effort to persuade them to invest money with him, see id. at 8-17; 29-32. What is clear is that Arbel well-knew the harm he caused others by

his criminal actions and simply did not care.  In any case, the record amply demonstrates that every detail of Arbel's history and characteristics was accounted for in his PSR and by the district court, and since he offers nothing new or even close to compelling evidence of his good character or extraordinary background, this argument for a sentence reduction too must fail.

Finally, Arbel showed a startling lack of remorse for his actions at sentencing which illustrates quite well the depth of his character, and this court noted that:

> Mr. Sercarz is very wise because what you started to do, Mr. Arbel, was to convey to me that *you really have no remorse*, started to convey to me how wonderful you were with Playco [one of Arbel's companies], how many people you employed. Mr. Sercarz stopped that very quickly and wisely suggested you take a different tact. [sic]

Sent. Tr. at 57 (emphasis added).  In short, an examination of Arbel's history and characteristics indicates that he enjoyed a privileged background; had ample ability and opportunity to conform to the law; was subject to no mitigating circumstances driving him to his crimes; remained essentially unremorseful at sentencing; continued to secretly commit other crimes, obstruct justice and hide assets; and should serve the full term of a sentence he deserved.

3.   Applicable Sentencing Range Under the Guidelines

Arbel claims that the court improperly enhanced his guidelines range for being an organizer, among other things, which resulted in an inappropriate increase in his applicable guidelines range. Arbel acts as if he attended a different sentencing. The record demonstrates that this court set forth in great detail why it found that the four-level enhancement under U.S.S.G. § 3B1.1(a) was appropriate and warranted: "I have no doubt Mr. Arbel is very much a leader and organizer of this massive fraud and that the upward four level adjustment for that is perfectly proper." Sent. Tr. at 9; see also PSR ¶ 49. This finding was entirely correct and reasonable in light of the guidelines and Arbel's conduct.

In defining the circumstances in which an enhancement for a leadership or organizational role is appropriate, the relevant guideline commentary instructs:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.4); see, e.g., United States v. Greenfield, 44 F.3d 1141, 1146-47 (2d Cir. 1995); United States v.

28

<u>Leonard</u>, 37 F.3d 32, 38 (2d Cir. 1994).  Arbel satisfied not just some but all of these factors, and the court properly held so.

First, Arbel exercised decision making authority over others which was essential to the success of the extensive securities fraud and money laundering scheme at Euro Atlantic. Arbel provided the capital for Euro Atlantic to retain brokers, provided the stock from companies he controlled knowing that brokers at Euro Atlantic would engage in deceptive practices to sell his stocks at falsely inflated prices, and directed the laundering of fraud proceeds through shell companies located here and abroad -- proceeds that were eventually converted to cash kickbacks, among other things.  It was Arbel who chose the companies whose stock was to be sold at the inflated prices.  <u>See</u> Tr. at 229-36, 282-84, 286-87, 319-21, 362-63, 651-52, 665.  It was Arbel who negotiated the price of the stock sold to Euro Atlantic. Tr. at 232-37, 295.  Indeed, Arbel demonstrated his control over this stock when he directed David Melillo to sign a document releasing a lock-up agreement that had never been disclosed to the public.  Tr. at 347-53.  Arbel also created false loan and mortgage documents and false stock transactions, among other devices relating to the companies he controlled, to cover up the frauds. <u>See</u> Tr. at 311-13, 428-48, 475-87, 531-40, 647.  Arbel further funneled kickbacks to corrupt brokers at Euro Atlantic in the form of cash and stock warrants to persuade them to continue to inflate

the price of the stocks he controlled.  Tr. at 234-36, 240-46,
281-83, 289-91, 292-93, 312-14, 335-40, 370-74, 517-18, 677-81,
688-89, 693-94.  Finally, Arbel chose the conduits for the transfer
of millions of dollars in illicit funds domestically and overseas.
Without question, Arbel exercised decision-making authority over
all of the companies and general authority over many of the
participants involved in the fraud.

It does not matter that another defendant may also have
played an organizer or supervisor role in the same scheme
warranting the enhancement for the defendant.  A co-conspirator's
larger role "in the day-to-day management of the criminal activity
. . . does not foreclose a finding that [the defendant] was also a
leader of the activity." United States v. Wisniewski, 121 F.3d 54,
57 (2d Cir. 1997) (organizer enhancement appropriate where evidence
included defendant's large-scale laundering of proceeds of the
offense and his ownership and active participation in the
business).  Thus, the fact that, as Arbel argues, Melillo may also
have exercised a management or supervisory role over others
involved in the Euro Atlantic pump and dump scheme does not
foreclose the application of the enhancement for Arbel's role.

Second, Arbel's participation in the offense was
substantial.  It is undisputed that Arbel's role was to obtain
blocks of stock for Euro Atlantic, where corrupt brokers would then
manipulate, or "pump up," the price of the stock and sell it at

inflated prices in return for huge profits enjoyed by Arbel and his co-defendants.  Arbel admitted as much during his plea allocution. In response to this court's questions, Arbel stated that he had employed schemes to defraud the investing public through false statements of material fact and that, in connection with this activity, Arbel had taken the following steps: (1) arranged to have Euro Atlantic serve as the managing underwriter of an initial public offering of MMCI stock, which Arbel controlled; (2) caused proceeds of the fraud amounting to $1,640,104.74 to be wired from one account to another to disguise the ownership of the funds; and (3) drew a check for $805,000 from a bank account in the name of Christopher Wolf and deposited it in one of Wolf's nominee accounts three days later to fund kickbacks for the brokers at Euro Atlantic.  Plea Tr. at 64.

Arbel's role was essential to the scheme.  As district court observed when considering the arguments for and against the enhancement:

> Ask yourselves a very simple question.  Would this Court ever have seen before it a person named Neil Grippa, Michael Kelly . . . David Melillo?  Would we ever have seen any of those persons in this courtroom but for the presence of Mr. Arbel?  How did they all get here? . . . What did they do there?
>
> They were pumping and dumping all of the worthless stock.  I don't know how many companies Mr. Arbel brought to these brokerage houses, boiler room shops, bucket shops. Whether Mr. Arbel was sitting in [Euro Atlantic] looking over the shoulder of these

> cold callers, these young men who were barely
> out of high school, making four and $500,000 a
> year in what can only be charitably described
> as fraud in stealing money from gullible,
> innocent people.  They were able to do that
> because Mr. Arbel was bringing them these
> companies . . .

Sent. Tr. at 44-45.

The importance of Arbel's role is further plain when
compared with that of the defendant in United States v. Escotto,
121 F.3d 81 (2d Cir. 1997).  In that case, which involved a
fraudulent telemarketing scheme in which callers from three "boiler
room" companies enticed customers to pay large amounts of money for
products and participation in sweepstakes that did not exist, the
Section 3B1.1 enhancement was affirmed based on evidence that (1)
the defendant had supplied "leads" to potential customers that the
telemarketers would then "cold-call" and (2) he, along with others,
set up all three of the companies.  Id. at 85-86.  Here, Arbel's
role was far more critical to the success of the scheme than merely
supplying "leads" to potential customers.  Arbel actually funded
the Euro Atlantic boiler room and supplied the stock that brokers
then sold to customers at inflated prices.  When Euro Atlantic
eventually failed, Arbel funded two new brokerage houses, West
America and Global Strategies, which conducted similar fraudulent
operations.  Tr. 521-27, 653-55, 700-702, 707-08.  Providing the
seed money and blocks of stock to boiler room brokerage houses
clearly outweighs merely giving a list of potential phone numbers

to telemarketers.   Moreover, in contrast to the defendant in
Escotto, Arbel created many more than three companies.   Arbel
established dozens of shell companies to facilitate the laundering
of illicit proceeds and Arbel admitted his ownership in them.   See
Arbel Letters to Probation; November 2003 Letter at GX-1.   Unlike
the defendant in Escotto, Arbel needed no assistance from others to
form all of those companies.   In fact, he instructed Melillo,
Dionisio and Locasio how to set up their own offshore accounts for
the purpose of concealing illegal stock proceeds.   Tr. at 519-20.

        Third, Arbel recruited others to assist him in the
scheme.   Arbel solicited the participation of Wolf including
offering to fund Wolf's crew of dirty brokers for the purpose of
increasing the output of Euro Atlantic's pump and dump operation.
March 2004 Memo at 6; Tr. at 259-63.   After Euro Atlantic closed,
Arbel recruited DeLuca, Melillo and Locasio to run other "spin-off"
boiler rooms.

        Fourth, Arbel had a right to a larger share of the fruits
of the crimes committed at Euro Atlantic.   Arbel stipulated that he
was accountable for a loss of between forty and eighty million
dollars.   PSR ¶ 29.   The record, which includes voluminous banking
and wire transfer records obtained from bank accounts he
controlled, including accounts he tried to conceal, demonstrates
that Arbel's share of the fruits of these crimes was unparalleled
by those of any of his co-conspirators.   PSR ¶¶ 24-30.

Fifth, Arbel's role in planning and organizing the fraud scheme was significant.  As stated above, Arbel controlled large blocks of stock in various companies which was ultimately transferred to Euro Atlantic where it was manipulated and sold at inflated prices.  Arbel was also instrumental in setting up two Euro Atlantic offices in Manhattan and Staten Island for the purpose of accomplishing the same illegal operation.  To fund these projects, Arbel gave Wolf $500,000 which Wolf, Dionisio and Locasio used to hire their crews of dirty brokers.  Arbel also directed the laundering of funds back to Euro Atlantic by using his offshore nominee accounts and instructed others on how they too could conceal their illegal profits offshore.

Arbel's role was far greater than that of a mere "provider of stock and investment money" as he suggests.  Arbel Br. at 25.  In United States v. Rosa, 17 F.3d 1531 (2d Cir. 1994), a four-step increase under Section 3B1.1 was upheld where the defendant had a sufficiently large organization to facilitate the offense, recruited a co-conspirator, gave him instructions, kept him informed of the conspiratorial plan, and ensured that he was provided with money.  Here, as the evidence at trial amply demonstrated, in addition to the payment of start-up costs for Euro Atlantic, Arbel paid Wolf to recruit other corrupt brokers, provided the stock to keep the firm afloat, directed payment of kickbacks to brokers and principals at Euro Atlantic through

34

accounts he controlled, instructed others on how to set up offshore accounts for the purpose of concealing illegal kickbacks, and funded and oversaw other pump-and-dump firms after Euro Atlantic closed. Thus, it was through his knowledge and efforts that the plan flourished into the complex securities fraud and money laundering operation that it became. See United States v. Twitty, 72 F.3d 228, 234 (1st Cir. 1995) ("A defendant who makes the critical strategic and operational decisions in a group enterprise can be deemed an organizer or leader") (internal quotations omitted)).

Sixth, as we have already detailed, the nature and scope of the illegal activity was substantial. Indeed, the district court remarked at sentencing that the number of victims Arbel defrauded was vast, and the amount of money he forfeited to the government but a fraction of the loss they incurred:

> Your observation with respect to he already forfeited the Hampton apartments, condominium, $1.5 million is simply, I don't have to remind you, Mr. Sercarz, that the fraud Mr. Arbel concedes to amounted to somewhere between $40 and $80 million so the fact he gave up $1.5 million hardly begins to account for the amount of money that Mr. Arbel's fraudulent conduct entailed.

Sent. Tr. at 38-39.

> A lot of letters that I received from people whose lives have been shattered in many respects as a result of the fraud which was perpetrated as a result of having taken their life savings, their retirement accounts and

> invested it in these worthless stocks and now
> in their old age virtually penniless [sic].
>
> So the fact that [Arbel] forfeited $1.5
> million doesn't begin to bespeak the extent of
> the fraud.

Sent. at 39.

Arbel counters, however, that he is similarly situated to Peter Gotti, the acting boss of the Gambino crime family, whose role the Court of Appeals held did not warrant an enhancement for being an organizer.  Arbel Br. at 25.  In Gotti, the Court held that there was a lack of evidence showing that Gotti "exercised decision-making authority in the commission of these crimes constituting the relevant conduct, that he participated in their commission. . .that he recruited any accomplices. . .[or] that the tribute payments he received amounted to a larger share of the fruits of the crime. . ."  United States v. Gotti, 459 F.3d 296, 349 (2d Cir. 2006).  However, Arbel's role was far greater than that of Peter Gotti.  As this Court found and the evidence amply supported, a role enhancement was warranted for Arbel's role as the architect of a massive securities fraud and money laundering operation which he led, controlled, recruited accomplices and from which he profited in amounts far more substantial than any of his co-defendants.

4.   Arbel's Health Does Not Warrant A Sentence Reduction

Arbel's health likewise should not entitle him to a
sentence reduction.   Guideline 5H1.4 indicates that "[p]hysical
condition or appearance, including physique, is not ordinarily
relevant in determining whether a sentence should be outside the
applicable guideline range."   U.S.S.G. 5H1.4.   The Second Circuit
has applied this guideline in United States v. Altman, recognizing
that conditions rendering a defendant "seriously infirm" might be
sufficient to warrant departure, but suggesting that a departure is
not warranted if a defendant's medical condition can be cared for
adequately by the Bureau of Prisons.   48 F.3d 96, 104 (2d Cir.
1995); see also United States v. Martinez, 207 F.3d 133, 139 (2d
Cir. 2000).   The Second Circuit has made clear that, "except in
extreme situations, physical condition is not a basis for downward
sentence departures."   Sapia v. United States, 433 F.3d 212, 219
(2d Cir. 2005); see also United States v. Lucania, 379 F.Supp.2d
288, 293 (E.D.N.Y. 2005) (no departure because defendant's ailments
were not "extreme or unusual").   Here, Arbel's medical problems can
be, and have been adequately cared for by the Bureau of Prisons.

Arbel's chief health complaint is that he suffers from
epilepsy.   Epilepsy is not an extreme or unusual physical
impairment and, despite Arbel's histrionics, is certainly not a
"terminal illness".   Arbel Br. at 18.   Although a serious
condition, epilepsy is "one of the most common disorders of the

nervous system" that allows most people to "live outwardly normal lives." See Epilepsy Foundation, About Epilepsy, http://www.epilepsyfoundation.org/about/(last visited May 16, 2007); see also National Institute of Neurological Disorders and Stroke, Epilepsy Information Page, http://www.ninds.nih.gov/disorders/epilepsy/epilepsy.htm(last visited May 16, 2007). Arbel has lived with epilepsy for over 33 years and clearly had no trouble perpetrating complex, multi-million dollar fraud schemes despite this illness. In other cases, courts have reduced sentences because the defendant's risk of harm to society has been lowered by the physical impairment. See e.g. United States v. Jimenez, 212 F.Supp.2d 214, 216 (S.D.N.Y. 2002) ("truly extraordinary" case where brain aneurysm left defendant less of threat to society); United States v. Pineyro, 372 F.Supp.2d 133, 139 (D.Mass., 2005) (reduced sentence where extraordinary condition leaves defendant less likely to commit future offenses). In contrast to these sorts of cases, Arbel committed his crimes while living with epilepsy and will have no trouble defrauding people again if he chooses to.

Further, there is no indication that this condition rises to the level of a serious infirmity which the Bureau of Prisons cannot treat. See PSR ¶ 73-76; Arbel Medical Reports. Arbel merely states that one can receive the "best treatment" from a highly-compensated private doctor. Arbel Br. at 18. The Bureau of

38

Prisons routinely handles prisoners with epilepsy and maintains well-trained staff and specific care guidelines for treatment, as illustrated by the reports of medical treatment and evaluations submitted by Arbel.   Indeed, although Arbel has had seizures while in custody, medication has been prescribed to reduce the reoccurrence of these seizures.   Arbel has received generic versions of the identical drug prescribed by his private physician and that medication has been "helpful."   PR ¶¶ 24.   Arbel concedes that the only treatment available for epilepsy is medication to reduce the likelihood of seizures, which he is currently receiving in prison.   He fails to explain how a private doctor's prescription of the same medications is of any further value.

In any event, Arbel's physical condition is not so extraordinary as to entitle him to a sentence reduction.   The Second Circuit and other courts have held that epilepsy does not necessarily warrant a downward departure. United States v. Felipe, 148 F.3d 101, 112-113 (2d Cir. 1998)(upholding district court decision to refuse downward departure for defendant with epilepsy, liver ailments, and asthma); United States v. Hammond, 37 F.Supp 2d 204, 209 (E.D.N.Y. 1999)(citing a First Circuit case and noting that courts have decided epilepsy does not warrant a downward departure).   In remanding Arbel after his guilty plea, the court noted its confidence that Arbel would receive facilities "more than adequate" to treat his medical conditions, and stated that it is a

routine occurrence that "persons are remanded who are in much worse physical condition than Mr. Arbel."  Plea Tr. at 66.

Arbel also points to his post-traumatic stress disorder ("PTSD") as further evidence of a physical impairment warranting a downward departure.  The same arguments as above apply here.  Arbel has lived with PTSD since his accident in 1973, committed massive fraud in spite of this disorder, and will remain able to perpetrate crimes in the future.  Notably, although Arbel complains of depression, his doctors have diagnosed him as "asymptomatic."  See Chronological Record of Medical Care.  In any event, the Bureau of Prisons is fully capable of caring for PTSD and depression, likely common ailments among inmates.  A comprehensive treatment plan has been created to deal with Arbel's "illnesses", he is receiving regular medical care from staff psychiatrists/psychologists under the plan as well as appropriate medication which has proven successful when taken, and this care will continue throughout Arbel's stay in prison.

Arbel's lame attempts to compare himself to the defendant in Simon v. United States, 361 F.Supp.2d 35 (E.D.N.Y. 2005) in his quest for a downward departure are not anymore convincing.  Arbel Br. at 21.  In Simon, the defendant received a downward departure based upon serious injuries he received while in jail.  In stark contrast, as we said before, Arbel's medical ailments were conditions Arbel had well-before his imprisonment, did not prevent

him from committing the instant crimes or obstructing justice, are
treatable and no more serious than experienced by his prison
compatriots.

     5.    Arbel's 120 Month Sentence Fulfills the Purposes Of
          Criminal Punishment

     Arbel's sentence of 120 months adequately and
appropriately "reflect[s] the seriousness of the offense. . .
promote[s] respect for the law, and . . .provide[s] just
punishment for the offense," protects the public, provides
deterrence and provides Arbel with a chance for training, care,
and other treatment.  18 U.S.C. § 3553(a)(2).

     As noted above, Congress, the Sentencing Commission,
and this court all found that criminal conduct such as Arbel's is
extremely serious, requiring serious penalties in order to
provide deterrence and just punishment.  See 19-21, supra.
Further, the need for deterrence and to protect the public is
particularly pronounced given Arbel's crimes both before
and after his guilty plea.  Id.  To suggest, as Arbel does here,
that his conduct was no different than that of his co-defendants
who received lesser sentences is absurd.  Other than David
Melillo, who cooperated, none of Arbel's other co-defendants (i)
were responsible for a fraud loss of $40 to $80 million; (ii)
engaged in efforts to twice obstruct justice and denied
acceptance of responsibility credit as a result; or (iii)
continued to commit criminal activity while in jail.

Arbel's post-plea conduct makes remarkably clear his utter disregard for the law, thus emphasizing the need for a strong sentence if only to deter future criminal conduct. Indeed, as we set forth in painful detail in our November 2003 Letter, since his guilty plea, Arbel has (a) engaged in corporate fraud by attempting to solicit investors in an otherwise defunct company whose stock he intended to dump once the stock was inflated; (b) used coded language to conceal these illegal transactions from the government;  (c) lied to the Probation Department about his true ownership and control in several companies; (d) continued to siphon money from investors in public companies he controlled to maintain his former wife's lavish lifestyle and to pay his relatives; (e) lied on his Financial Affidavit about his ownership and control over numerous companies; (f) directed his relatives to act on his behalf including instructing them, in coded jail-house conversations, how to disguise various transactions; and (g) attempted to conceal assets abroad to avoid paying the $8 million forfeiture order or restitution to his victims.  We submit that the *only* means available to reflect the seriousness of the offenses committed by Arbel and his substantial role in them, promote respect for the law, provide just punishment and afford adequate deterrence is for Arbel to serve the full 120 month sentence imposed by this court.

Arbel laughably asserts that because of his age, and the fact that he will be deported to Israel, his birth country, means  he will not likely recidivate.  Arbel Br. at 15.  First, considering that Arbel committed these frauds over a number of years involving victims both here and abroad, was arrested in his mid to late 40's for them, obstructed justice at age 49 after his arrest by attempting to bribe a co-defendant, continued to swindle businessmen, a lawyer and an inmate and tried to conceal assets from the government at age 50, he is hardly the best example of whether or not someone older will commit crimes again.

In <u>United States v. Williams</u>, 475 F.3d. 468 (2d Cir. 2007), a case strikingly similar to the instant case, Williams, a 56 year old convicted of drug trafficking and mail fraud and sentenced as an organizer, argued that his 216 month sentence was unreasonably long based on the fact that because of his age, he was unlikely, if released from prison, to be a repeat offender. <u>Id</u>. at 478.  Williams further contended, like Arbel does here, that a shorter sentence would enable him to be with his children, who had been adversely affected by his incarceration, and enable him to seek medical care, among other services.  <u>Id</u>.  The Second Circuit disagreed holding that although William's sentence was substantial, it was "well-within the broad range of reasonable sentences that the District Court could have imposed in the circumstances presented."  <u>Id</u>.(quoting <u>United States v.</u>

Fernandez, 443 F.3d 19, 34 (2d Cir. 2006).  Indeed, the Court
concluded that given William's convictions and his obstruction of
justice, he could have faced a statutory maximum sentence of life
imprisonment or consecutive sentences, and thus his sentence was
perfectly reasonable.  Id.  Similarly, the district court could
have, but did not, impose the high end of the guidelines of 135
months imprisonment, or upwardly depart from the guidelines or
Arbel's Criminal History Category based on his obstruction of
justice and continuing criminal conduct while in jail.  See Sent.
Tr. at 53-54.  Thus, Arbel should not quibble about his 120 month
sentence which was, under the circumstances, absolutely
appropriate and not unreasonably long.

          Second, the fact that Arbel will eventually be deported
to Israel in no way supports his "I won't recidivate" argument.
The Second Circuit has held that imposing non-guidelines
sentences based on future deportation "would weaken the deterrent
effect of punishment," because "some potential criminals may
consider deportation preferable to imprisonment and would
therefore not be as deterred from committing future crimes if
they thought they would be deported rather than serve all or part
of what should be their appropriate prison term."  United States
v. Wills, 476 F.3d 103, 108 (2d Cir. 2007).  We submit this
tactic is exactly what motivated Arbel to seek to withdraw his
pending motion in return for a prisoner transfer to Israel-- that

is, the hope that once in Israel he will serve much less time in jail.  In any event, it his connections to Israel, including his efforts to secretly conduct illegal business while incarcerated by using his relatives there, and his efforts to conceal assets there that continues to alarm the government.  Thus, Arbel's deportation will do nothing more than put him right back into the criminal element from which he so magnificently profited at the expense of others.

Finally, Arbel contends that the Sentencing Commission supports the belief that a first offender will have a lower rate of recidivism.  Arbel Br. at 15-16.  However, is seems unlikely that the "first offender" philosophy had in mind a defendant like Arbel who (i) engaged in a fraud that involved tens of millions of dollars and hundreds of victims who will <u>never</u> be made whole; (ii) twice attempted to obstruct justice; (iii) failed to pay a forfeiture order while at the same time concealing thousands of dollars in assets abroad; and (iv) continued to swindle victims from his jail cell.

6.  A Guidelines Sentence Satisfies the Need to Avoid
    <u>Unwarranted Sentence Disparities</u>

Arbel argues that there is, nevertheless, great disparity in his sentence compared to that of his many co-defendants.  At the outset, with a Guidelines sentence, the need to avoid such disparities, under 18 U.S.C. § 3553(a)(6) is "presumptively satisfied."  <u>United States v. West</u>, 2005 WL

180930, *7 (S.D.N.Y. 2005); see also United States v. Wilson, 350
F.Supp.2d 910, 925 (D. Utah 2005)(stating that because "the
Guidelines are the only standard available to all judges around
the country today ... [they] should be followed in all but the
most exceptional cases")), reaffirmed by United States v. Wilson,
355 F.Supp.2d 1269, 1271 (D. Utah 2005)(noting that "heavy
reliance on the Guidelines is the only way to avoid unwarranted
sentencing disparity"); United States v. Peach, 356 F.Supp.2d
1018, 1021-22 (D.N.D. 2005)(holding Guidelines to be
"presumptively reasonable" and carrying "substantial weight" and
noting data showing that post-Booker, federal courts were still
sentencing pursuant to the Guidelines in the "overwhelming
majority of cases")); but see Simon v. United States, 361
F.Supp.2d 35, 40 (E.D.N.Y. 2005)(holding that the "Guidelines are
advisory and entitled to the same weight accorded to each other
factor that the Court is instructed to consider")).

         However, although courts are not prohibited from
considering sentencing disparity among co-defendants, they are
also not required to do so.  See United States v. Wills, 476 F.3d
at 110-11.  "So long as factors considered by a sentencing court
are not inconsistent with those listed § 3553(a) and are
logically applied to the defendant's circumstances, we accord
deference to the court's 'broad discretion in imposing a sentence
within a statutory range.'"  Id.(quoting United States v. Parker,

462 F.3d 273, 277 (3rd Cir.), <u>cert</u>. <u>denied</u>, 127 S.Ct. 462 (2006)).   Here, Arbel's sentence of 120 months fell squarely in the middle of the sentencing range applicable to him and, therefore, was presumptively reasonable given his circumstances as compared to his co-defendants.

There is no dispute that Arbel's sentence was one of the highest of his co-defendants.  However, in light of the extent and scope of Arbel's criminal conduct versus the conduct of those co-defendants, his efforts to obstruct justice, the millions of dollars in losses to victims, his role as an organizer and his failure to accept responsibility for his crimes, as this court carefully noted, his sentence was perfectly appropriate.  Indeed, like Christopher Wolf, who was sentenced to 130 months imprisonment, and his two organized crime confederates, Enrico Locasio and Dominick Dionisio, who received 63 months and 97 months, respectively, Arbel received exactly what he deserved as the organizer of a massive securities fraud and money laundering scheme that relied on Arbel-owned companies, Arbel-controlled stock and Arbel-funneled kickbacks to further what was a lucrative boiler room operation.

More importantly, and notably omitted in Arbel's recitation of the sentences imposed on his co-defendants, Arbel's sentencing range was based on a fraud loss between $40 and $80 million, a staggering number not attributable to any of his co-

47

defendants except David Mellilo.  For example, Louis Catapano was
accountable for a fraud loss of between $800,000 and $1.5
million; Glen Deluca was accountable for a fraud loss in excess
of $2.4 million; Stephen DiBenedetto was accountable for a fraud
loss between $2.5 and $5 million; Neil Grippa was accountable for
a fraud loss of approximately $151,000; Brett Hamburger was
accountable for a fraud loss of $340,000; Michael Kelly was
accountable or a fraud loss of approximately $6,992,000; George
Matarazzo was accountable for a fraud loss of between $1.5 and
2.5 million; Enrico Montaperto was accountable for a fraud loss
of between $2.5 and $5 million; Stephen O'Donnell was accountable
or a fraud loss of between $800,000 and $1.5 million; and Robert
Valente was accountable for a fraud loss of between $350,000 and
$500,000.  Thus, other than Melillo, who cooperated, testified at
Arbel's trial and received a 5K1.1 letter, none of Arbel's co-
defendants faced guidelines ranges based on a fraud loss as
substantial as that attributable to Arbel.

        Arbel also conveniently fails to mention that his
guidelines range was greater because of his efforts to twice
obstruct justice, a factor which applied to none of his co-
defendants, even his organized crime confederates.  The district
court imposed a two-level enhancement for obstruction of justice
on two grounds: Arbel's secret payments to Wolf's mother and
attorneys and his failure to disclose assets to the government.

As to the first ground, the court explained that the evidence was

more than sufficient to establish that Arbel's bribe payments

were intended to influence Wolf's decision whether or not to

cooperate with the government:

> Looking at all the surrounding facts and
> circumstances in regard to the Wolf matter,
> one would, I think, very justifiably infer
> that the purpose of making a rather
> substantial payment or payments on behalf of
> Mr. Wolf was not for some mercenary purpose
> but for the purpose which the government
> suggests amounted to an obstruction justice.
> Mr. Shargel received a check of $50,000.  Mr.
> Shargel told the court in connection with a
> motion to disqualify him that he really
> didn't know where the check came from or what
> it was about. . . .
>
> Aside from that, what inference would
> one draw, what purpose is served by
> attempting to conceal by bookkeeping ledger
> de main, about $500 a month . . . to Mr.
> Arbel's mother [sic]. . .She performed no
> services for Hollywood Productions . . . She
> wasn't an employee.  It wasn't a sum of money
> which required a deduction for social
> security or other tax obligations.  It was
> money which was attempted to be concealed,
> money orders, checks drawn, money orders
> bought.  What purpose is served by that? .
> . . What inference would one draw if Mr. Wolf
> owed Mr. Arbel a lot of money and hadn't paid
> it, why would Mr. Arbel continue to advance
> money to Mr. Wolf in addition to the money
> which was owed him that Mr. Wolf hadn't paid?
> I think on the subject of intent, the
> government has made its case
> circumstantially, by a preponderance of the
> evidence certainly, one might say by evidence
> which is clear and convincing.

Sent. Tr. 36-37.

As to the second ground, the court found absolutely no

legitimate justification for Arbel's failure to disclose two bank

accounts he controlled that contained funds, particularly since

these non-disclosures continued even after he was caught

concealing his control over a number of companies.

> With respect to the assets, I think it's
> fair to say that throughout all of the
> proceedings in this court in which Mr. Arbel
> appeared, represented by very able counsel,
> if there was any doubt about what anything in
> any document calling for information that he
> was required to give, if there was any
> question about vagueness or ambiguity,
> certainly could [sic] have asked his lawyer
> to explain it if it was vague and ambiguous
> to counsel advising Mr. Arbel with respect to
> the information he was required to give,
> counsel would have inquired of the
> government. Does this require Mr. Arbel to
> advise this, that and the other thing? Not
> only that . . . there was a time when [the
> government] called the Court's attention . .
> . [to] a dispute . . . between defense
> counsel and the government at the time the
> defense counsel wanted to know, give us the
> name of the accounts that you say Mr. Arbel
> didn't disclose. [The government] said we
> don't want to tell you. [Arbel] said . . . we
> ought to know what these accounts were. I
> think I directed [the government] to tell
> him. . . . Even then Mr. Arbel wasn't
> disclosing all of the information which the
> financial disclosure forms required him to
> provide. Forty accounts which he didn't tell
> the government about. Then a couple of more
> have turned up recently which I think, under
> well established principles of law, conclude
> obstruction of justice.

Sent. Tr. at 37-38. Without question, Arbel was given an

opportunity to comply with the terms of his plea agreement by

submitting an accurate Financial Statement even after the

government had detected significant non-disclosures in the

original statement he submitted at the time of the guilty plea.

Remarkably, although Arbel denied in the second statement that he

had any assets remaining from his multi-million dollar fraud, he

omitted from the statement the only two accounts that happened to

contain funds, justifying the court's rejection of his argument

that some of his holdings had merely slipped his mind when he was

preparing the statement.  For these reasons, the district court's

imposition of the enhancement was fully justified.

Finally, Arbel ignores the fact that he was denied a

reduction for acceptance of responsibility, under U.S.S.G. §

3E1.1(a), based on the untimeliness of his guilty plea.  The

court described in detail the inappropriateness of the reduction

in such circumstances:

> [I]f the purpose of 3E1.1 is to give a
> defendant acceptance of responsibility who
> has early on candidly recognized his conduct
> as being illegal and avoids, insofar as the
> government is concerned, the necessity for
> the kind of massive, massive preparation
> which the government had to do to prepare for
> this trial, and I've been involved in this
> case now for a long time, and have listened
> to a lot of persons who have pleaded guilty,
> and I don't know how many documents I've
> read, presentence reports, 302s, memoranda,
> all of which Mr. Arbel recognized early on,
> face the reality early on what he did was
> terribly wrong and pleaded guilty early on,
> he would have been entitled to an acceptance
> of responsibility, separate and apart from
> whether or not continued conduct thereafter
> would have disqualified.

Sent. Tr. at 7-8.

In addition, Arbel's post-plea conduct, including his coded jailhouse conversations in which he continued to engage in suspicious securities transactions and attempted to conceal other assets provided further grounds upon which to deny him a reduction for acceptance of responsibility:

> I could make the final observation, the Court's decision with regard to the obstruction which is dispositive of the issue of acceptance of responsibility because as I read the guidelines, absent the most extraordinary circumstances, a finding by the court there has been obstruction particularly in post-plea behavior mandates the Court not provide a defendant with points for acceptance of responsibility . . .

Sent. Tr. 45.  Thus, Arbel can hardly compare himself to some of his co-defendants who, unlike Arbel, cooperated and made efforts to rehabilitate themselves after conviction.  See Arbel Br. at 30(b), 31(c), 31(d), 33(h) and 34(j).  Accordingly, since there was no error in the district court's decision to deny him a two-level reduction[6/] for acceptance of responsibility, and enhance

---

[6/] Section 3C1.1 of the Guidelines provides for a two-level enhancement where

> the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . .

Application Note 4 of Section 3C1.1 sets forth examples of conduct to which the enhancement applies, including the following: (1) "unlawfully influencing a co-defendant [or] witness . . . or attempting to do so," U.S.S.G. § 3C1.1, comment. (n.4(a)); (2) concealing or procuring others to conceal evidence that is material

his sentence for obstruction and being an organizer, the resulting increase in Arbel's guidelines range was not clearly erroneous and the resulting 120 month sentence amply justified and reasonable.  See United States v. Fuller, 426 F.3d 556, 562-63 (2d Cir. 2005)(within sentencing court's discretion to upwardly depart based on articulated reasons about seriousness of defendant's conduct).

> 7.  Arbel's Sentence is Appropriate Compared to Other Federal Sentences

Arbel seeks to compare his sentence against the "mean and median" sentences meted out nationally and within this Circuit in order to show his sentence is inappropriate.  In reality, the statistics tell us that Arbel got precisely what he

---

to an official investigation or judicial proceeding, or attempting to do so, U.S.S.G. § 3C1.1, comment. (n.4(d)); and (3) providing materially false information to a judge, U.S.S.G. § 3C1.1, comment. (n.4(f)), or to a probation officer in connection with a presentence investigation, U.S.S.G. § 3C1.1, comment. (n.4(h)).  The enhancement also applies to "conduct prohibited by obstruction of justice provisions under," for example, 18 U.S.C. §§ 1510 and 1511. U.S.S.G. § 3C1.1, comment. (n.4(I)). Section 1510 makes it an offense to:

> willfully endeavor by means of bribery to obstruct, delay or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator . . .

The unlawful influence may be direct or indirect, see United States v. Rivera, 971 F.2d 876, 893 (2d Cir. 1992), and warrants application of the enhancement whether or not it has the desired effect on the disposition of a proceeding, United States v. Lincecum, 220 F.3d 77, 80-81 (2d Cir. 2000).  See also United States v. White, 240 F.3d 127, 138 (2d Cir. 2001) (enhancement appropriate where defendant was overheard telling a co-defendant to tell police drugs were hers, even though he later admitted to owning the drugs); United States v. Kirsh, 54 F.3d 1062, 1073-74 (2d Cir. 1995) (enhancement appropriate where defendant made misrepresentations to a court in support of his bail motion); United States v. Echevarria, 33 F.3d 175, 179 (2d Cir. 1994) (enhancement appropriate where defendant misrepresented himself as a doctor to the sentencing court).

deserved.

First, Arbel fails to point out that the vast majority
of sentences were either within the guidelines range or departed
downward due to government support.  In 2006, for example, 84.1%
of fraud sentences nationally and 77.6% of fraud sentences in the
Second Circuit were above or within the guideline range, or
departed below at the recommendation of the government.  UNITED
STATES SENTENCING COMMISSION, STATISTICAL INFORMATION PACKET: FISCAL YEAR
2006, SECOND CIRCUIT, http://www.ussc.gov/JUDPACK/2006/2c06.pdf.
These numbers are substantially similar for 2003-2005, both for
fraud specifically and the overall sentencing rates for the
Second Circuit and nationally.  See generally, United States
Sentencing Commission, "Federal Sentencing Statistics",
http://www.ussc.gov/linktojp.htm.  Though Arbel seeks to
favorably compare his circumstances to the "average" fraud
sentence, the reality is that he is asking the court to place him
within the exceptional 10-20% of cases where a downward departure
absent government support is warranted.  Arbel's comparison to
other federal sentences is correct in this one respect: like the
vast majority of all the other cases, Arbel was appropriately
sentenced within the guideline range.

Arbel's use of sentencing statistics is also deeply
misleading.  He points to statistics to show that the mean and
median sentence length for "fraud" is low in comparison to his

own sentence.  Yet it makes little sense to compare Arbel's

multi-million dollar securities fraud conspiracy to the broad

primary offense category of "fraud", which comprises numerous

different crimes of varying degrees of seriousness and statutory

sentence length.  In fact, the only thing we can be certain is

similar between sentences that comprise the mean/median "fraud"

in the report and Arbel's offense is that they all started at a

base offense level of 6 or 7.  U.S.S.G. §2B1.1(a).  Beyond this,

average statistical measures about criminal offenses related to

fraud tell us little about a defendant convicted of substantial

securities fraud violations--specifically, the factors set forth

in 18 U.S.C. § 3553(a).

　　　　By looking beyond thin statistical measurements to the

factual context of actual securities fraud cases, it is clear

that Arbel's guideline sentence is appropriate.[1/]  In United

States v. Rosen, the defendant was convicted of securities fraud

and conspiracy to commit securities fraud, and was sentenced to

14 months imprisonment followed by three years of supervised

release.  409 F.3d at 535, 538 (2d Cir. 2005).  Following a plea

agreement, the low sentence was given because the loss was

between $10,000 and $30,000, there was acceptance of

responsibility, and the defendant had no criminal history.

Rosen, 409 F.3d at 539-540.  A defendant who caused comparatively

_____

[1/] Some of the cases mentioned are not published or are summary orders.  They are
not cited for precedential effect, but merely to compare sentences received by
other defendants against the one received by Arbel.

minor financial harm, plead guilty prior to trial, and accepted
responsibility for his actions is about as far from Arbel's
circumstance as one could imagine.

The defendant in United States v. Kirk plead guilty to
securities fraud violations of 15 U.S.C. §§ 78j(b) and 78(ff) and
conspiracy to commit securities fraud under 18 U.S.C. § 371.  180
Fed.Appx. 207, 208 (2d Cir., 2006)(Summary Order).  Kirk was
sentenced to 37 months imprisonment and three years of supervised
release.  Id.  Like Arbel, this was within the sentencing
guidelines range for the particular defendant.  However, the
defendant was shown to have only caused $1.5 million to $2.5
million in financial loss – forty times less than Arbel.  Brief
for Defendant-Appellant, United States v. Kirk.  In United States
v. Schlisser, another case that involved securities fraud and
wire fraud, the defendant was sentenced to 60 months
imprisonment.  168 Fed.Appx. 483 (2d Cir., 2006) (Summary Order).
Again, the loss caused by the defendant amounted to between $1.5
and $2.5 million, resulting in the guidelines range applicable to
this defendant.  Brief for the United States of America-
Appellant, United States v. Schlisser.  As these cases bear out,
the comparison Arbel makes to the "average" fraud is backwards:
he is similar in that he was sentenced within the guideline
range, and different because his higher range is based on a much
larger degree of financial harm and his other criminal conduct.

        Cases where defendants received sentences greater than
Arbel further demonstrate the appropriateness of his sentence.
In United States v. Cushing, the defendant received 60 months and
97 months imprisonment terms to run concurrently for conspiracy
to commit securities fraud, obstruction of justice, and perjury.
99 Fed.Appx. 269 (2d Cir., 2004) (Summary Order).  The defendant
was held to have caused $24 million in financial loss.  Id. at
271.  In United States v. Bennett, the defendant was convicted of
securities fraud, mail fraud, bank fraud, money laundering,
obstruction of justice, and perjury, and sentenced to 22 years
(264 months) in prison.  2006 WL 738162 (S.D.N.Y.), Not Reported
in F.Supp.2d.  The Court found that the defendant had caused
"hundreds of millions of dollars" in harm.  Finally, in United
States v. Ebbers, the defendant was found liable for securities
fraud and sentenced to 25 years (300 months).  458 F.3d 110, 113
(2d Cir., 2006).  Ebbers, one of the architects of the WorldCom
fraud, caused massive financial harm and received a 26 level
enhancement for a loss of over $100 million.  Id. at 117.
Notably, the Second Circuit held that the sentence was not
unreasonable despite substantially lower sentences for the other
co-conspirators.  Id. at 129.  The point here is not to say that
Arbel's case is identical to the WorldCom fiasco.  Rather, like
Ebbers and the other aforementioned defendants, Arbel's sentence
is consonant with the financial harm he caused.

57

When placed in comparison to other federal sentences, Arbel's sentence is perfectly appropriate given the millions of dollars involved, the tragic consequences for the numerous victims harmed, his obstruction of justice and the leadership role he played.  Put simply,  Arbel's crime is no run-of-the-mill fraud that can be easily compared to the mean or median fraud statistics.  Rather, his crimes underscore why he deserves and should serve the guidelines sentence he received.

B.  Arbel's Sentence Was Otherwise Reasonable

The district court properly identified and applied the relevant guidelines range, considered all of the other factors under 18 U.S.C. § 3553(a) and imposed a sentence of 120 months that was entirely reasonable.

In reviewing whether a district court's sentence was reasonable, the Second Circuit will look to whether the sentence was substantively reasonable, that is, whether it "was reasonable in light of the applicable Guidelines range and other factors set out in 18 U.S.C. § 3553(a)." United States v. Giovanelli, 464 F.3d 346, 355 (2d Cir. 2006).  The Court will next look to whether the sentence was procedurally reasonable, that is, whether a sentencing court considered the Guidelines mandatory or advisory, pursuant to Booker, and whether it "actually" looked to the guidelines range that applied and the other 3553(a) factors. Id.  Here, the sentence imposed by the district court was both

substantively and procedurally reasonable in all respects.

First, as has been set forth in detail above, the substantial securities fraud and money laundering crimes committed by Arbel, his obstruction of justice and failure to accept responsibility and his role as an organizer formed the basis of the significant guidelines range Arbel faced, and this court carefully articulated its reasons for applying the recommended range at sentencing.  Second, the court noted that the applicable guidelines range did not accurately reflect the gravity of Arbel's crimes, including the tens of millions of dollars in fraud loss and resulting harm caused his victims--thus indicating that it was not constrained by the then-mandatory nature of the Guidelines but rather thought the range applicable to Arbel perhaps *understated* the seriousness of his criminal conduct.  Further, the court considered, but did not impose, an upward departure in Arbel's guidelines range based on his continuing criminal conduct while in jail.  Finally, the court carefully considered the other Section 3553 factors, including the nature and circumstances of the offenses, as well as Arbel's history, characteristics and medical condition, before imposing a sentence of 120 months--a sentence in the middle of his guidelines range.  That decision was not unreasonable.  Arbel does not now deserve a lesser sentence just because he has served some time in jail, misses his family and feels bad about his

predicament.

Nor does, or should, Arbel's purported medical circumstances entitle him to a sentence reduction, especially one that would be a substantial deviation from the guidelines range recommended by the Sentencing Commission.  See United States v. Rattoballi, 452 F.3d 127, 132-33 (2d Cir. 2006)(district court's are not permitted to "exercise unfettered discretion" in sentencing inconsistent with the factors set forth in 18 U.S.C. § 3553(a)(quoting Crosby, 397 F.3d at 113)); see also United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005); United States v. Smith, 445 F.3d 1, 3 (1st Cir. 2006).  These infirmities are no more serious than other inmates who, like Arbel, have previously diagnosed illnesses that are being professionally treated by the Bureau of Prisons.  Accordingly, Arbel should serve the entire 120 month term of imprisonment.

C.   Forfeiture and Restitution Should Be Imposed

The government requests that the court impose a forfeiture order in the amount of $8 million, and a restitution amount of $40 million, which is mandatory.

At sentencing, the court ordered that Arbel pay a $20 million forfeiture based on the government's misread of the plea agreement, which set forth a Forfeiture Money Judgement in the amount of $8 million and:

> "in addition to the forfeiture Money Judgment, to the forfeiture to the United States of all assets in which

> he has any direct o[r] indirect interest, but fails to
> disclose on the Financial Statement, if any, up to the
> amount of the forfeiture sought in the charging
> instrument, twenty million dollars ($20,000,000)."

Plea Agr. at 9; see also Sent. Tr. at 62.  While the government

had discovered assets that Arbel failed to disclose as required,

the remedy for such failure, as provided in the agreement and

consent order, was not that the forfeiture amount would jump from

$8 million to $20 million, but that the government could forfeit

up to  $20 million of the additional undisclosed assets.

Moreover, the $20 million figure was to include the Forfeiture

Money Judgment of $8 million.  Thus, although the discovery of

undisclosed assets entitles the government to forfeit those

assets up to $20 million, it did not permit amendment of the

Forfeiture Money Judgement from $8 million to $20 million.

With respect to restitution, Arbel's PSR set forth a

mandatory restitution in the amount of $40 million.  PSR ¶ 103.

However, we  do not believe the court ordered restitution as

required and  restitution was not made part of the Judgment of

Conviction.  See GX-1.  During sentencing the following

conversation occurred:

> I don't know about restitution.  There are literally
> hundreds and hundreds of people whose names have been
> provided to me who have suffered losses as a result of
> investments in these worthless stocks.  Restitution is
> mandatory.  There is a provision in United States Code,
> restitution sections, which in effect say if
> restitution would be completely unrealistic, the Court
> could make some token order of restitution. I don't
> know which is appropriate.  The amount of restitution

>           here would have to approximate something like $40
>           million.  It would be mandatory, payable to the Clerk
>           of the Court and the Clerk of the Court with the
>           assistance I suppose of the United States Office of
>           Probation would attempt, assuming any portion of that
>           money we deposited with the Clerk of the Court, to
>           attempt to figure out who it is on this massive list of
>           victims that money should got to.
>
>           I'm looking for some guidance from you, Ms. Kedeshian,
>           from the United States Attorney.  Assist me.  tell me,
>           help me. What do you suggest? What are you asking eh
>           Court to do by way of restitution?  I suppose I cold
>           what the statute says, order Mr. Arbel to make
>           restitution in the amount of $40 million payable to the
>           Clerk of the Court, let it sit there.

Sent. Tr. at 60-61.  The court then quizzed the government on the

issue of "restoration," that is, using forfeiture to pay victims

for their losses in the event no other monies are available.  Id.

at 63.  However, although the government can recommend that

forfeiture monies be applied to restitution, the final

restoration decision is made by the Department of Justice only

after imposition of the restitution order and a careful review of

the facts.[8/]  In order for that process to begin, an order of

restitution must be entered orally and made part of the Judgment

of Conviction.  Moreover, this court is not foreclosed from

ordering restitution now even though restitution was not imposed

at sentencing or part of the mandate from the Second Circuit.

"[A] district court may resentence beyond the scope of the

mandate, or may resentence a defendant on a limited remand using

_____
[8/]  Here, Arbel has paid some monies towards his forfeiture order, including
monies from the sale of property, which can, if DOJ decides, be applied toward
restitution to Arbel's victims under the Restoration policy.

fresh considerations, if it has 'cogent' or 'compelling' reason,
including 'the need to correct a clear error.'"  United States v.
Johnson, 378 F.3d 230, 243 (2d Cir. 2004)(quoting United States
v. Quintieri, 306 F.3d 1217, 1230 (2d Cir. 2002)(no error in
district court's imposition of mandatory restitution during re-
sentencing)); see also United States v. Vondette, 2007 WL
1120432, 7 (E.D.N.Y.)("'the mandate rule generally prohibits the
District Court from re-opening the issue on remand unless the
mandate can reasonably be understood as permitting it to do so'.
. .However, the mandate rule does not prevent a District Court
from considering an issue if the issue was not part of the
appellate decision."(quoting United States v. Ben Zvi, 242 F.3d
89, 95 (2d Cir. 2000)).  Here, since the issue of restitution was
not raised on appeal or made part of the remand, and there was
clear error in its failure to order restitution at sentencing,
the district court is permitted to impose it now.

63

III.                    <u>CONCLUSION</u>

        Based on the foregoing, we request that the district court deny Arbel's motion for a sentence reduction in any amount. We further request that the court impose a forfeiture order in the amount of $8 million and order Arbel pay restitution in the amount of $40 million.